YOUNG C. BOVARD, Plaintiff in Error, *v*. THE STATE.

1. INSANITY: HOW IT AFFECTS CRIME.—It is not sufficient to absolve from criminal responsibility, that the party charged was partially insane, and that such insanity was attended with delusion, unless it also appear that the act was committed under the direct, or necessary influence of such delusion.
2. SAME.—A person, although partially insane, will not be excused from responsibility, if he have reason and capacity sufficient to distinguish between right and wrong, as to the particular act he is doing, and to know that it is criminal, and will subject him to punishment.
3. SAME.—The rule on the subject of insanity, as affecting crime, laid down in *Commonwealth* v. *Rogers*, 7 Met. R. 500, cited, recognized, and adopted.

IN error from the Circuit Court of Yazoo county.   Hon. E. G. Henry, judge.

Young C. Bovard, the plaintiff in error, was indicted in the Circuit Court of Yazoo county, for the murder of Amanda J. Bovard, his wife, on the 20th day of November, 1855.   There was no controversy as to the fact, that the prisoner committed the homicide.   The defence relied on was, that the act was done whilst the prisoner was insane.

On this point the proof was in substance as follows :—

H. Cox, for the state.—Saw Bovard about two o'clock, on Wednesday, the 21st of November, 1855; he was in his kitchen, hand-. cuffed; said he had done the deed.   Witness proposed sending for a coroner, to hold an inquest; Bovard objected, and said he did not want to be questioned by a lawyer, and that he would answer nothing, except what suited him : he said it was unnecessary to confine him, as he would not go away.   The dead body of Mrs. Bovard was seen by witness—it was then hardly cold; the head was mashed in by a maul, which stood near it.   Prisoner has

drunk a great deal of late years, but has not been changed much by it. He was peaceable and kind in his family.

Mrs. S. Simmons, for the state.—Is a sister of Mrs. Bovard; saw Bovard about nine o'clock on Wednesday morning; he asked her to forgive him; said he would not then tell the reason that induced him to kill his wife, but would at some other time: said that Mrs. Bovard wished his sister, Mrs. Quini, to have the children.

W. H. Mangum, for the state.—Keeps a hotel in Benton; prisoner was brought there after the killing; saw him there on Wednesday evening; he was then asleep in a room up stairs: he awoke up and recognized witness; said he must have been crazy when he did the deed. Witness was the surety of Bovard, and consulted him about being secured; Bovard proposed to let him have a horse at $175; witness declined, because the price was too high, and proposed to leave it to two men to fix the price; Bovard agreed to this, and said he would reduce the price assessed by them, ten dollars. The referees assessed the value of the horse at $135, and Bovard said: "According to my promise, you can have him at $125." On the next morning had a settlement with him, embracing various business transactions. His recollection was good; he named items in the account which had been forgotten by witness—which was right. Prisoner asked witness, if he could not plead guilty before the justice of the peace, and be committed without a trial—he wished to dispense with the formality of a trial. He said, also, that he wanted to plead guilty at the Circuit Court, and asked witness, if four or five weeks would not intervene between his conviction and execution: said he and his wife had had several serious difficulties.

*Cross-examined.*—Witness has been at Bovard's house frequently, and he and his wife seemed to be affectionate. Prisoner has drunk a great deal for the last three or four years, and has fattened or bloated, and become a great deal larger. About two weeks before the killing, prisoner was at his house, very much intoxicated; he was too drunk to know what he was about; there was nothing remarkable about him then, more than usual with

drunken men: the next morning he was nearly sober. Prisoner retained his senses when drunk, better than most men.

Dr. Potts, was at Bovard's on Wednesday morning, and examined the body of Mrs. Bovard; she seemed to have died, from the appearance of her body, about twelve or one o'clock, at night. Has known prisoner for about two months, and has seen him drunk, but never saw any symptoms of delirium about him.

A. Johnson, for the state.—Witness, with others, guarded the prisoner on Wednesday night, at Benton. After night, prisoner was apparently asleep—snoring: he awoke up, and said: "Gentlemen, I am going to make a confession—you may think I am crazy, but I am not: I want your attention. I have been guilty of many crimes, and am a deep-dyed villain: I have wished my father and mother, and brothers and sisters, and wife, and negroes, all dead. After my marriage, I have had sexual intercourse with negroes and with beasts;" and that he had wound up his career, by committing the foulest murder on record. His countenance then changed, and he said: "You are all the deepest-dyed villains out of hell;" and that if he had his way, he would cut our throats, and send us to hell in a minute. He said, also, when he was getting religion, he had confessed all to his wife, and she had forgiven him. He slept, or seemed to sleep, both before and after the confession. Those who were present were all friendly with him.

McCrome and Stevens, stated in substance, the same as Johnson. Stevens also stated, that for the last few weeks, the prisoner had got drunk every time he came to Benton.

T. Shirley, for the defence.—Witness had known prisoner since he was a boy, and they lived three or four miles apart. He was kind and affectionate in his family. Has seen prisoner generally about two or three times a week; about three weeks before the killing, he (witness,) was at Bovard's, to clean out his well; prisoner was then very friendly, and said he would make four thousand bushels of corn. Witness looked at him, and said: "Why, old Major Vaughan would not make that much on one of his plantations." Prisoner replied, he'd be d——d if he didn't make the four thousand bushels of corn. There was something strange about him. Witness suggested, that he should send for A. Prest-

ridge, to help clean out the well; and prisoner replied, that he was as strong as two jackasses, and could pull witness up and down, himself. Witness concluded to permit prisoner to help, and he let witness down in the well, and acted very carefully. After witness had come out of the well, the prisoner wanted to let witness down again by hand. Witness staid at Bovard's till after dinner, and prisoner was very social, and bragged a good deal on his children, and asked witness to bring one of them a coat. At dinner, he said his wife always knew how to fry chickens better than any one. He seemed flighty on that day. Witness saw prisoner afterwards in Benton and Yazoo City, drunk. There has been a great change in him since he commenced drinking.

*Cross-examined.*—Can't say that he has been drunk all the time, for the last six months. Witness has seen him drunk at home. Never saw any craziness about him, except at the well; at other times he was like other drunkards: his conversation about the corn, jacks, and chickens, was the strange conduct noticed by witness, and they were the only foolish remarks made by him that day: witness conversed with him a good deal; he was a little drunk. He did not make over four hundred bushels of corn.

Martin Frisby, for defence.—Has known the prisoner for fifteen years; for the last five or six, he has been drunk a great deal. He was drunk on Thursday after the election, (about two weeks before the killing,) and had been so for three or four days previous; never saw anything peculiar about him when drunk. During Monday and Tuesday of the election he was drunk, but knew what he was about.

Mrs. Mary Quini, for defence.—Is a sister of prisoner; Bovard was at her house on Monday, the 19th of November, before the killing on Tuesday night; he looked very wild out of his eyes— acted strange—and changed the subject of conversation very frequently, and walked more rapidly than usual. About two hours after dark, of that night, he came running back, hallooing, and saying that he had got religion; and that he had come to tell us of it; that his wife had got religion, and was the happiest woman in the world. He wanted us to get religion, and made witness and her husband, Mr. Quini, get down and go through the reli-

gious performance with him.  He prayed and preached, and said he had turned preacher : he frequently ran out in the gallery, as if watching for something, and said that he would have religion in a few minutes—that he saw it coming down from heaven.  He came to the house without hat, shoes, or coat on, although it was very cold; Mr. Quini offered him his hat, coat, and shoes, but he said no, he would not take them; that he (Quini,) would soon be taken with a great conviction, and would have to leave the house, and would need them.  He then started home, but merely went around the house, and came in at the back gallery; he called me out, and said that he had seen a great many things, and that his friends, who were dead, had told him that we would all be dead in less than a month; that he saw a field of green corn and a team of mules turning round in it; that something had told him that he must get religion publicly; and that he got it in presence of his wife, and never stopped until she got it.  I got cold standing in the gallery, and sent for my shawl; he told me to send my shawl for his wife; that Mr. Quini would soon be taken with a great conviction, and that he wanted his wife there, to help pray for him. I then persuaded him to go home, and he concluded to do so ; he started, and was gone about fifteen minuies, and returned without the hat, shoes, and coat, that Mr. Quini had loaned him.  He came back, hallooing, and called Mr. Quini out, and told him that a certain old negro had got religion; he then went home—which was about three-quarters of a mile distant—and got some clothes, and came back, hallooing as before.  He mentioned several of his friends by name, and said they had got religion; Mr. Quini persuaded him to go to bed.  He and Mr. Quini went into a room, and he prayed aloud; he was then quiet for about two hours, and I thought he was asleep; he awoke me by his loud groaning.  He came to our room, and asked for a bible; Mr. Quini told him he had no light to read by, and to go to bed; he went back, and staid about five minutes, and then got up and soon went off towards his home, running and hallooing.  He left his clothes that he had brought, and went home in his night clothes.  He came back about eight o'clock next morning, and said, " Good morning, to Mr. Quini," who was not present.  He asked me, what I thought of

things the night before, and said there had been a host of people there, which was untrue; I told him it was all in his imagination. He said he wished he could believe that it was. He also stated that we would all be dead in a short time, and that he had heard a voice, going to Dr. Simmons, telling him that some great bank had failed, and that he had better run his property, or he would lose it all.

He then asked for breakfast; said he had eaten nothing that morning; that breakfast was ready when he left home, but he could not wait for it. Whilst eating, he would frequently look down the road, and would tell me what "that little bell" told him, and that we would all die soon; he turned round, and said Parson Young was there, but he was not; he said that he had promised to help pole in the grave-yard, and went off rapidly, taking his clothes with him; he got nothing to drink that day from us, and did not eat like he usually did when drunk.

*Cross-examined.*—He ate dinner on Monday more heartily than usual; I observed then no wildness about him, except his frequently changing the conversation; on Monday night his whole conversation was about religion; he continued to manifest his flightiness on Tuesday morning, and staid then about an hour.

Mr. Quini, for defence.—This witness stated in substance the same as Mrs. Quini, except that he was not at home on Monday during the day, nor on Tuesday morning when Bovard came and got breakfast. In addition, he stated, that about two o'clock next day, that he, witness, together with Mr. Brown and Thos. Prestridge, went to Bovard's house to see him; Brown and Prestridge stopped at the gate, and witness went in; Bovard asked them to get down and come in; they did so, and Bovard brought chairs, and told them to sit down. He slapped his hands together, and said that he could not stay with them, and then went into his room, where he staid a few minutes, and then went out, as if he were going to witness's house; he was praying and looking up; he asked me for my horse, and said he was bound to go to Benton that day, and Yazoo city the next; I declined loaning that one, but said I would send for another; he afterwards refused to go. On Tuesday evening about sun-down, Bovard came to where

Brown, Prestridge and myself were, in his field, and we dispersed; I met him, and we walked together; we saw a horse, and he asked me what that horse was doing with a rail on his neck; I told him the horse had no rail on his neck, but he insisted that he had, and I then agreed to it in order to pacify him. I asked Mr. Brown if he would go with us and get Bovard to Dr. Wood's; Brown said he could not; Prestridge agreed to go, and came over, but by that time Bovard refused to go that evening, but said he would go next morning. Witness heard Bovard, that night, about eight o'clock, hallooing and praying; witness was at home, and the distance about three-quarters of a mile.

*Cross-examined.*—Bovard was not drunk on Saturday or Monday before the killing; he showed no disposition on Monday night at my house to do violence; his mental alienation seemed to be about religion; he spoke of his lame arm, and said it was well; on the next day he showed no disposition to do violence; he said that we thought he was crazy, but he was not.

B. W. Brown, for defence.—Has lived near Bovard for twelve years; was at his house with Quini and Prestridge, on Tuesday evening about four o'clock, before the killing; Bovard asked me and Prestridge to come in; we did so; he handed us chairs, and looked at us as if astonished, and said: " Gentlemen you must content yourselves, I must lie down." He looked wild out of his eyes; he went off in a room, and staid fifteen minutes or a half hour, and then came back again hallooing, and remarked to me that he had got religion, and as well as I recollect, he put his arms around my neck, and said: " Beah, we are old schoolmates, I have got religion and am happy;" he warned me to get religion, and said we must all die soon: he made the same remarks to Quini, and to his wife, taking the latter round the neck; he then went out of the house, and stopped under a tree, clasped his hands and hallooed like setting on dogs; and cried. He remained there about ten or fifteen minutes, and then came back and went into his room: he called his wife in the room, and I then heard him praying for her: and she would occasionally say, "Young, let me alone;" they remained in the room some ten minutes—she first came out, and he continued praying for three or four minutes, and then came out. " He seemed

to be in a happy condition, just like I have seen people, getting religion." He then clasped his hands and hallooed, and said you may think I am crazy, but I am not; he said "Hiram" was dead. I told him he was not; he insisted that he was, and that the coroner was then holding an inquest over him; he then went out under the same tree, and acted as before, and soon afterwards came in hallooing and clapping his hands, and went into his room crying. I proposed to Quini, to send for a physician; Bovard then came out crying and went back in about minute: we then went into his room, and Bovard remarked to Quini, that he wanted to go to Dr. Wood's; Quini objected to his going to town; Quini asked me to go with him: I declined, but promised to get Prestridge to go; I left soon afterwards to see Prestridge. I examined Bovard closely, and he did not seem to be in his natural condition; he looked wild out of his eyes; I did not see him drink any, and he did not look like he did when drinking. I saw no indications of hostility to his wife, but on the other hand, he seemed to be affectionate to her.

*Cross-examined.*—Bovard's whole action seemed to be under religious excitement, and his conversation was principally on that subject. He seemed to talk rationally on the subject of going to see Dr. Wood; Quini was with me, and could see and hear all that I could.

Thos. Prestridge, for defence.—I was at Bovard's on Tuesday evening with Brown and Quini: Bovard brought us chairs, and then went into his room, when he came out and left.

*Cross-examined.*—I saw nothing peculiar or remarkable in his appearance on that occasion; I saw him at the grave-yard on Tuesday morning; he was there a short time, and assisted in planting a post. There was nothing then remarkable or unusual in his appearance or conduct; he appeared to be sober; his conversation was partly rational, and at times he talked rather like a crazy man.

Dr. Wood, for defence.—Has practised medicine fifteen years; has known Bovard about ten years; saw him on Monday before the killing about 12 o'clock M., about one-half mile from Benton, on his way from that place home; he was walking, and said he

had been to see me—that one of his arms was sore, and he had a pain in his neck and shoulder. Witness examined the arm, and thought it was paralyzed from excessive drinking; has seen Bovard frequently at Benton, but never saw him walk to town before; he appeared to have been drinking a good deal, and to have just cooled off; his eyes were red and watery, and he looked as if he had been crying; he did not then have delirium tremens; this disease sometimes attacks the patient immediately after he ceases to drink, and sometimes it is three or four days afterwards; it affects the mind as much as any other kind of mental derangement; the mind when diseased in this way sometimes takes one direction, and sometimes another; the disease sometimes produces an irresistible impulse to homicide. A person affected by it, is restless and unable to sleep. Bovard has been drunk a good deal of late years, and has been somewhat changed in appearance by it.

*Cross-examined.*—Witness has practised in Bovard's family for several years past, and never knew him to have mania-a-potu; the mania generally continues without lucid intervals, until the disease is removed. Never knew a person laboring under an attack of it, to lie down voluntarily and remain quiet for two hours. A want of appetite is a characteristic of the disease; sometimes the mind of the patient is fixed on one subject, and sometimes on another, and it sometimes changes from one to another; if the mind is insane on religion, it would be partially deranged on other subjects. If a patient affected by delirium tremens were to sleep, his disease would not return in ten or twelve hours, unless the same cause re-produced it.

*Re-examined* by defendant.—Persons affected with mania, may lie down and yet not sleep. Witness has seen insane persons act and speak rationally.

Doctors Gadbury and Barnett, were also examined on the symptoms and effects of mania-a-potu, but they did not state anything materially different from the testimony of Dr. Wood.

Mr. Prestridge, for the state.—Witness saw Bovard on the day preceding his wife's death. At times witness thought he was rational, and other times he thought differently. Witness conversed with prisoner fifteen or twenty minutes; he asked witness,

Bovard *v.* The State.

if he had heard the news from Texas, and said he had heard it clear to his house; said we all had to die that day month; said he could satisfy his mind on this subject, by going to Benton; saw nothing peculiar about prisoner, indicating insanity; prisoner was not drunk; witness passed by prisoner's house twice on Tuesday night near seven o'clock; prisoner was singing; saw him next morning about three o'clock: his wife was then dead; witness was present when prisoner and H. Cox had the conversation in the kitchen, and saw and heard nothing peculiar, or indicating insanity; has known the prisoner for three years; he has been very intemperate, but witness never saw him have mania-a-potu; prisoner was generally peaceable.

*Cross-examined.*—When witness saw prisoner on Tuesday he talked foolish, but looked natural; he remarked to Thomas Prestridge, that he had better look sharp, that if he had not got his wife pregnant, he would not be liable to do so, as he would die in a month.

Dr. Holmes, for the state.—Witness saw Bovard, on Wednesday the next day after the killing: he was asleep. Witness did not think he was laboring under any disease; his pulse was natural. There was nothing peculiar about him, and nothing to indicate insanity. Witness has known Bovard for a long time, and he never saw him have mania-a-potu.

Mrs. S. Simmons, *re-examined* by the state.—Witness saw Bovard, on Wednesday morning, soon after the killing, say about nine o'clock; witness had a conversation with him, and he appeared perfectly natural; he asked witness to forgive him for the deed. Witness told him she could not, and asked him why he did it; he replied, he could not tell witness then, it was too bad, but would do it some other time; witness told him that she should never see him again, and he then remarked that he would write to her from the jail, in Yazoo city. Witness asked him what disposition he wanted made of his children; he said his wife always said she wanted his sister Mary Quini, to have them; he then invited me out of the room; witness saw no symptoms or indications of insanity in him.

Dr. B. G. Simmons.—Is a brother-in-law of Mrs. Bovard, the
VOL. I.—39

deceased; witness has known the prisoner, for a long time; for a few years past, prisoner has been very much dissipated; witness saw prisoner, on Sunday preceding the killing on Tuesday night; he then appeared to be perfectly sober, and said nothing indicating insanity; witness saw prisoner, on Wednesday morning, about sun-rise; witness went into the room where he was confined, and conversed with him; witness asked him, why he killed his wife? He told witness to go away, and that he would talk to witness some other time; witness suggested, that his feet should be confined, and prisoner complained of the hand-cuffs hurting him; witness saw no indications of insanity, and believes prisoner was in perfect good mind. On the next day, witness had a conversation with prisoner, on business; he talked rationally about it; he also said he wanted to make some provision for his children, and asked witness to have an obligation drawn up for that purpose.

G. Finucane, for the state.—Witness saw Bovard on Monday, the 19th November, 1855, about eight or nine o'clock, A. M.; saw him purchase some sugar from Mr. Gibbs; witness talked with him about some work, which Bovard had promised to do for him: he said that he could not do it; witness saw no indications of insanity, though he did not observe the prisoner very particularly or closely.

W. H. Mangum, *re-examined* for the state.—In the conversations alluded to by witness, in his first examination, he saw and heard nothing indicating insanity; witness acted and spoke perfectly rational; witness said to prisoner that he must have been drunk, when he committed the deed; and he said he was not, but must have been crazy.

H. E. Manning, for the state.—Witness has known Bovard for a long time, and has had a great many business transactions with him; witness saw the prisoner on the Monday preceding the killing on Tuesday night, and was in his company a half-hour. Prisoner said he had quit drinking: witness saw nothing about him indicating insanity, and he appeared to be as much in his right mind as ever; witness saw him on Wednesday also, and heard him talk, and saw him questioned; prisoner then looked as if he

had been sitting up at night, or taking opium : he looked foolish and stupid, but witness saw nothing indicating insanity.

Tilman Davis, for the state.—Witness is the jailor of Yazoo county, and has kept the prisoner since his commitment; witness has seen and heard nothing during his confinement in jail, indicating that Bovard was insane; he is perfectly sound in mind, so far as witness knows.

The following instructions were given on behalf of the state :—

1. The law presumes every man to be sane, until the contrary is proven.

3. That if the jury believe from the evidence, that the accused killed the decease with malice, and not in necessary self-defence, he is guilty of murder, notwithstanding they may believe, he was at the time of committing the deed, laboring under partial insanity, unless he was, from such insanity, incapable of understanding the nature and consequences of his act, and of knowing that it was wrong, and that he would be punished for it.

4. That insanity, however produced, constitutes no excuse for crime, unless it be so great as to deprive the party of his power to understand the nature of his act, of his ability to distinguish between right and wrong, and of his ability to understand that he will be liable to punishment, if he commits it.

5. That though a party be partially insane, yet he is responsible for his criminal acts, unless it appear that he was prompted or instigated by his madness to perpetrate such act.

6. That if the homicide charged, is proven in the opinion of the jury, the barbarity of the act affords no legal presumption of insanity in the accused.

It is unnecessary to set out the instructions which were given for the defendant.

The prisoner's counsel also asked the court, in substance, to charge, first, that the fact of Bovard having an opportunity to escape if it existed, and his refusal to do so, was a circumstance which they could consider, in determining his sanity; second, that in the absence of reasonable motive on the part of Bovard to commit the crime, the law was for him; third, "that insane persons will not admit that they are insane, but on the contrary will endeavor to

prove, that they are sane by conversation or conduct, and if the jury believe from the evidence, the defendant by conversation or conduct endeavored to convince others that he was sane, when in fact he was not, the law is for him, and they will acquit;" fourth, that if defendant committed the deed, when too drunk to distinguish right from wrong, without any previous design formed in his sober moments, he is not guilty; fifth, *that insanity is never feigned until after the act is done*; and if it is proven that the defendant was insane, before or about the time the act was done, the law presumes that the insanity continued until its commission, and the state must remove this presumption by satisfactory proof. All of these were refused.

No counsel appearing for plaintiff in error, *Glenn,* attorney general, moved the court to appoint counsel for him; whereupon the court appointed

*John M. Moore,* for plaintiff in error:—

Cited and commented on *Commonwealth* v. *Rogers,* 7 Met. R. 500; *The State* v. *Gardner,* Wright, Ohio R. 392; *Stale* v. *Spencer,* 1 Zab. R. 196; 1 Greenl. Ev. § 42; Ray, Med. Jur. 413; 1 Copeland, Dictionary of Medicine, 572; 1 Cyclopedia of Practical Medicine, 587.

*D. C. Glenn* attorney general, for the state, argued the cause orally.

Smith, C. J., delivered the opinion of the court.

The plaintiff in error was indicted and tried in the Circuit Court of Yazoo, for the murder of his wife. No question whatever, was raised, as to the fact of homicide, or the agency of the accused in the commission of the deed. The defence was placed solely on the ground of insanity; and the jury having found the prisoner guilty of the charge, a motion was made to set aside the verdict, and for a new trial. The grounds upon which the motion was based were, first, misdirection in the charges to the jury, and, second, that the verdict was contrary to law and evidence. The

same reasons are now urged as a ground for reversing the judgment.

In support of the first ground it is insisted, that the third, fourth and fifth instructions for the state, are erroneous, inasmuch as they "do not properly and fully explain the legal consequences of insanity, and lay down rules for the guidance of the jury, under which the accused might be convicted, although proved by the evidence to have been insane, at the time the alleged offence was committed."

The only questions which could properly arise upon the evidence before the jury, were, first, whether the accused labored under a general derangement of his moral and intellectual faculties; second, whether he was affected with partial mania, accompanied with a delusion which was connected with, or embraced in the circle of its operation the act with which he was charged; and third, if by the proof he was shown to have been either generally or partially insane, whether the insanity was of such a character as to absolve him from responsibility as a moral agent.

A person, in the estimation of the law, to be capable of the commission of a crime, must have intelligence enough to have a criminal intent and purpose; and if his mental capacity is either so deficient that he has no conscience, nor will, nor controlling mental power over his actions; or, if, through the access of mental disease, his intellectual power is for the time completely suspended, he is not to be regarded either as a moral agent, or punishable by the law for his acts.

Cases of insanity, of such extreme character as these, are not easily mistaken. And it is not to be controverted, that the prisoner, as shown by the evidence, was not so totally deprived of conscience, will, or mental control over his actions, or that his intellect and capacity were not so utterly deficient as to be incapable of entertaining a criminal purpose.

But in cases of partial insanity, where the mind, though capable of acts of memory, of reasoning, and of judgment, is clouded and weakened, or so perverted and influenced by insane delusions, as to be compelled, as it were, to act under false impressions and influences; the rule of law, as it is now generally understood, is

laid down by Chief Justice Shaw, as follows : " A man is not to be excused from responsibility, if he has reason and capacity sufficient to enable him to distinguish between right and wrong, as to the particular act he is then doing—a knowledge and consciousness that the act he is doing is wrong and criminal, and will subject him to punishment. In order to be responsible, he must have sufficient power of memory to recollect the relation in which he stands to others, and in which others stand to him ; that the act he is doing is contrary to the plain dictates of justice and right, and injurious to others, and a violation of the dictates of duty. On the contrary, although he may be laboring under partial insanity, if he still understands the nature and character of his act, and its consequences ; if he has a knowledge that it is wrong and criminal, and a mental power sufficient to apply that knowledge to his own case, and to know, that if he does the act he will do wrong, and receive punishment ; such partial insanity is not sufficient to exempt him from responsibility for criminal acts. *Com.* v. *Rogers*, 7 Met. R. 500.

Without quoting the instructions to which exception is taken, or noticing them in a more special manner, it is sufficient to state, that they contain, in very distinct and intelligible terms, the rules laid down by the learned judge in the charge, from which we have quoted above. In our opinion, therefore, there was no error committed, in giving the instructions which were requested, in behalf of the prosecution. Nor do we think there was error in withholding either of the instructions which were requested by the prisoner, and refused by the court.

The remaining ground upon which reversal of the judgment is claimed, is, that the motion for a new trial was improperly overruled. The question thus presented, must, of course, be determined by the evidence submitted to the jury ; and we will proceed to notice such of the facts established by the testimony, which tend to prove, or disprove the insanity of the accused.

The homicide was committed on the night of the 20th of November, 1855. The prisoner was, for several years previous to that date, a man of intemperate habits ; some eight or ten days before the deed was committed he was very much intoxicated, but

it was supposed that he had abstained entirely from drink, for the five or six days immediately preceding the 20th of November. On the 19th he had been at Benton, which was four miles distant from his place of residence; and on his return he was met by Dr. Woods, who had previously been his physician; he complained of being unwell; he said his right arm was dead, and he could not use it; he complained of soreness about the shoulders and neck. Dr. Woods, from a slight examination, thought it might be paralysis, arising from intemperance. He was rational, and the doctor observed no symptoms of delirium tremens, or any indication of mental derangement of any description, about him. On the same day he was at Mr. Quini's—dined there—and ate more heartily than usual; Mrs. Quini observed no wildness in his appearance at dinner: he frequently changed the subject of conversation; acted strangely, and walked more rapidly than usual. He went away, and returned some time after dark; he then appeared to be under some delusion connected with the subject of religion: he said he had got religion; that his wife had got religion, and was the happiest woman in the world; he had come back to tell Quini and wife of it; he wished them to get religion also; and insisted upon their getting " down, and going through the religious performance;" he prayed, preached, and said he had turned preacher. He frequently ran out into the piazza, and seemed to be watching for something; said that they would get religion in a few minutes; that he saw it coming down from heaven.

These acts and declarations, and many others of a similar character, and quite as frantic and absurd, if they were not simulated, undoubtedly show that he was affected with partial insanity, attended with delusion, on the subject of religion.

He left Quini's, and returned again the same night; the weather was cold, and he went back in his shirt and drawers, without hat or shoes; and behaved in the same way. He was persuaded to go to bed, and was supposed to sleep; he remained quiet for two hours: he then got up and went away. On the following day, the 20th of November, at eight o'clock, he returned to Quini's, and deported himself much in the same manner that he had on the previous night. He asked for breakfast; said that he had eaten

nothing that morning; that breakfast was ready when he left home, but that he could not wait. He sat down to the table, and ate as usual. On the 19th or 20th, he spoke of his "lame arm," and said that it had got well. From Quini's, after having remained an hour, he went to the grave-yard and assisted in putting down a post; a person being then engaged in paling it in. He was rational; and while there, evinced no indications of mental alienation. At home, in the evening of the 20th, his conversation and conduct indicated that he was under the same delusion under which he appeared to labor in the morning, and on the preceding night. He was kind and affectionate to his wife, and manifested great solicitude on her account. He showed no dislike or hostility to any one; did not appear to be suspicious of any one; and although he said they would all be dead in a short time, he did not appear to be alarmed on that account.

On the 21st, the day following the commission of the deed, he appeared to be in full possession of his intellectual faculties; he confessed his crime; described its atrocity in the strongest terms; expressed great remorse at having committed the deed, but declined to state his motive for its commission.

Late in the evening of that day, he was visited by Dr. Holmes. The doctor was under the impression that he was asleep, when he first went in; his pulse was natural, and he thought that the accused was not laboring under any disease whatever. He had known the accused for many years, and had never seen him with the symptoms of mania-a-potu upon him. On the occasion of this visit, he saw nothing about the accused which indicated insanity.

In reviewing the evidence in the case before us, it is impossible to come to the conclusion that the plaintiff in error, at the time he perpetrated the crime, was affected with a mental malady, which involved his entire intellectual faculties; and there are very cogent reasons for rejecting the hypothesis, that his affection was that of delirium tremens.

According to an approved writer on the medical jurisprudence of insanity, this disease—delirium tremens—at its approach, is generally attended, amongst other symptoms, with disturbed sleep and impaired appetite; after the symptoms have continued for two

or three days, they increase in severity, the patient ceases to sleep altogether, and soon becomes delirious. At first, the delirium is not constant—the mind wandering during the night—but during the day, when its attention is fixed, capable of rational discourse. It is not long, however, before it becomes constant, and constitutes the most prominent feature of the disease. This state of watchfulness and delirium continues three or four days, when, if the patient recover, it is succeeded by sleep, which at first appears in uneasy and irregular naps, and lastly, in long, sound, and refreshing slumbers. Ray, Med. Juris. 417.

" Almost invariably," says the same author, "the patient manifests, more or less, feelings of suspicion and fear, laboring under continual apprehension of being made the victim of sinister designs and practices." One of the most common hallucinations is, to be constantly seeing devils, snakes, vermin, and all manner of unclean things about him, and peopling every nook and corner of his apartment with these loathsome objects. The extreme terror which these delusions often inspire, produce in the countenance an unutterable expression of anguish, and frequently impels the patient to the commission of suicide."

Assuming this to be a correct description of the course, and constantly attendant symptoms of mania-a-potu, it is difficult, if not impossible, to believe that the accused labored under that disease.

The disease, if it ever existed at all, did not manifest itself until the afternoon of the 19th of November; for, on that day, at dinner, none of its peculiar and marked symptoms were observable; on the contrary, he was neither irrational nor delirious, and ate more heartily than usual. On the following morning, although, if we judge from the evidence in relation to his conduct during the night, his malady had made most rapid progress; he ate his breakfast with unimpaired appetite, and went, in compliance with his promise, to assist in putting an enclosure around the grave-yard; and whilst there, disclosed no indication of irrationality, or symptom of delirium tremens. These facts are irreconcilable with the idea, that if he labored under any mental affection, it was that of delirium tremens.

The total absence of almost every marked peculiarity usually attendant upon this disease, and particularly, the short continuance of the attack, and the complete restoration of the accused to his natural, sound, and healthy state, within less than thirty hours after its commencement, render this conclusion unavoidable.

There are several facts and circumstances connected with this transaction, as they appear from the evidence, which might well have authorized the jury to doubt whether the accused was at all affected with any form of mental malady. But, conceding that there was no attempt at simulated mania, on the part of the accused, and that he in fact did labor under some disease of the mind, which amounted to partial, but very temporary insanity; according to the rule of law which must govern in the case, he is clearly to be held responsible for his act.

There was no proof that the accused had not capacity and reason sufficient to distinguish between right and wrong, in relation to the act which he committed; or that he had not a knowledge and consciousness that it was wrong and criminal, and that punishment would be inflicted upon him, in consequence of its commission; on the contrary, he was perfectly rational, except in reference to a single class of subjects, about which he seemed to entertain very wild, ridiculous, and absurd notions. But there was no proof before the jury, which, either directly, or by inference, showed that the fancy, or delusion under which he labored, had any connection, as the antecedent or cause, with the commission of the offence. It is not sufficient to absolve from the penalties of the law, that the party charged was partially insane, and that such insanity was attended with delusion. In all such cases, it is essential that it be clearly shown, in order to excuse, that the act was committed under the direct or necessary influence of such delusion.

Judgment affirmed.